# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 2, 2009

Charles R. Fulbruge III
Clerk

No. 08-20159

CERTAIN UNDERWRITERS AT LLOYDS LONDON

Plaintiff – Appellant-Cross-Appellee

v.

WAN E LAW; SIE L TSU

Defendants – Appellees-Cross-Appellants

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-CV-3360

Before O'CONNOR, Associate Justice (Ret.),[*] and WIENER and STEWART, Circuit Judges.

WIENER, Circuit Judge:

Thieves stole copper tubing out of seventeen free-standing commercial air-conditioning units permanently installed on the roof of a vacant office building owned by Defendants-Appellees Wan E. Law and Sie L. Tsu (the "Laws"). The Laws' commercial property insurer, Certain Underwriters at Lloyd's, London ("Underwriters"), denied coverage based on the insurance policy's theft exclusion, and this declaratory action by Underwriters ensued. The district

---

[*] The Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

court held that coverage was available, apparently (but not completely clearly) basing its holding on either (1) the policy's coverage of vandalism damage or (2) the policy's burglary exception to its theft exclusion; and both parties appealed. We reverse the holding of the district court in favor of the Laws and render a take-nothing judgment against them.

## I. FACTS AND PROCEEDINGS

The facts of the underlying theft are not in dispute. In April 2005, thieves climbed onto the roof of the Laws' building in Houston, tore off portions of the exterior panels that formed the housings of each of seventeen air-conditioning units, then broke into the units themselves to steal their copper condenser coils. The salvage value of the stolen copper was less than $2,000, but the total damage to the air-conditioning units caused by the thieves in the course of stealing the copper was closer to $200,000. The Laws reported the theft to Houston police and filed a claim with Underwriters for the costs of repair and replacement.

One of the coverage provisions of the Laws' commercial property policy expressly provides coverage for loss caused by vandalism, but excludes coverage for damage resulting from theft. The theft exclusion contains an exception, however, excepting from the exclusion (and thus restoring coverage for) any damage resulting from burglars breaking into or exiting from the insured building.

Underwriters denied coverage based on the policy's theft exclusion and sought a declaratory judgment in district court that it had no duty to indemnify the Laws. The Laws counter-sued seeking a declaratory judgment that their claim was covered.

The district court granted the Laws' motion for summary judgment and awarded them $177,150, the gross cost of repair minus the salvage value of the stolen copper, plus attorneys' fees. The award was based on the parties'

stipulation of the repair costs incurred by the Laws and the salvage value of the stolen copper tubing. Both parties filed timely notices of appeal.[1]

## II. ANALYSIS

We review a district court's grant of summary judgment and its interpretation of an insurance policy *de novo*.[2] When, as here, jurisdiction is based on diversity of citizenship, we apply the substantive law of the forum state, in this case, Texas.[3]

Underwriters makes two claims of error: The district court (1) misinterpreted the insurance policy; and, (2) in any event, the court miscalculated the damages.

### A. The Insurance Policy

The vandalism provision at issue, which also contains both the theft exclusion and the exception to that exclusion for damage from breaking and entering, reads, in relevant part:

> **A. Covered Causes of Loss**...
> Covered Causes of Loss means the following:
> ....
> **8.** Vandalism, meaning willful and malicious damage to, or destruction of, the described property.
> We will not pay for loss or damage caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

---

[1] The Laws never filed a brief in support of their appeal; they only responded to Underwriters' brief and, in so doing, made no claim of error.

[2] *See*, *e.g.*, *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 368 (5th Cir. 2008) (summary judgment); *Assurity Life Ins. Co. v. Grogan*, 480 F.3d 743, 745 (5th Cir. 2007) (citing *Riner v. Allstate Life Ins. Co.*, 131 F.3d 530, 533 (5th Cir. 1997)) (interpretation of insurance policy).

[3] *See*, *e.g.*, *Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). The parties here are diverse. Underwriters is a foreign citizen; the Laws are citizens of California.

The instant dispute turns on whether the damage to the Laws' air conditioners is (1) vandalism (the "vandalism coverage"), (2) damage caused by or resulting from theft (the "theft exclusion"), or (3) building damage caused by the breaking in or exiting of burglars (the "ingress/egress exception").

Underwriters asserts that the damage done to the roof-mounted air conditioners resulted from theft and is therefore excluded from coverage by the theft exclusion, insisting that the district court misconstrued the policy by finding coverage under the ingress/egress exception to that exclusion. The Laws counter that the district court correctly found coverage under the vandalism provision, but that, alternatively, coverage would also have been available under the ingress/egress exception.

The parties thus disagree about the basis of the district court's ruling, and the reasons for the court's decision are less than pellucid to us. There can be no question, however, that because the district court found coverage for damage to the air conditioners, its judgment must rest on one of two different findings: The damage resulted either from vandalism or from the actions of burglars breaking into or exiting from the Laws' building.

*1. Texas Law*

We look first to background principles of Texas law that govern the interpretation of contracts in general and insurance policies in particular.[4] We must interpret the contract in a manner that gives effect to every provision and to the "intention of the parties as expressed in the instrument."[5] Words not defined in a contract are to be understood "according to their plain and ordinary

---

[4] *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (principles of contract interpretation also apply to the interpretation of insurance policies).

[5] *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518-19 (Tex. 1980).

meaning."[6]    Texas finds ambiguity in a contract only when its words are susceptible of at least two different but reasonable interpretations.[7] Ambiguity will not be found, however, simply because the parties or the lawyers — or even judges — can come up with different interpretations of the words of a contract.[8] If — but only if — ambiguity is found, the contractual language will be "liberally" construed in favor of the insured.[9]  This is so even when the insurer's interpretation appears to be the more likely reflection of the parties' intent, provided the insured's interpretation "is not itself unreasonable."[10]

The dissent concludes that the controlling provisions of the policy are ambiguous then relies on the pro-insured penumbra in Texas law to find coverage.  But, even recognizing that reasonable minds can disagree, we are compelled to repeat for emphasis that this Texas maxim favoring the insured applies only after the court determines that there is ambiguity in a policy's wording — and we find none here.  Therefore, like the courts of Texas, we conduct our analysis pursuant to ordinary principles of contract interpretation.

---

[6] *Gray & Co. Realtors, Inc. v. Atl. Hous. Found., Inc.*, 228 S.W.3d 431, 434 (Tex. App.–Dallas 2007, no pet.).

[7] *See*, *e.g.*, *DeWitt County Elec. Co-op, Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999) ("A term is not ambiguous because of a simple lack of clarity. . . . [A]mbiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. Further, for an ambiguity to exist, both potential meanings must be reasonable.") (internal citations omitted).

[8] *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Creative Dev. Co.*, 232 F.3d 406, 414 n.28 (5th Cir. 2000) ("A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (quoting *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985) (internal quotation marks and citation omitted))).

[9] *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987).

[10] *U.S. Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 355 (Tex. 1971).

Indeed, this is where, with the utmost respect, we part company with the dissent: It finds ambiguity then finds coverage by crediting the insured's interpretation of the putatively ambiguous language over that of the insurer; we find no ambiguity in the operable terms of the Laws' policy then interpret the plain meaning of the words to ascertain the mutual intent of the parties to the contract. And when we do so, we discern no possibility that the parties intended to extend the theft exception's coverage of damage incidentally caused by burglars while entering or leaving the building to include damage caused by rooftop (exterior) thieves to freestanding air-conditioning units.

Consideration of the pertinent policy provisions at issue in this case appears to be one of first impression in Texas and in this Circuit.[11] We therefore begin, as we must, with the text, and we assess each potentially applicable category of coverage and exclusion in turn.

*2. Vandalism*

Although the district court never expressly labeled the damage as resulting from vandalism per se, the Laws insist that the district court nevertheless based its holding on a determination that the damage was caused by acts of vandalism.[12] We acknowledge that, in its broadest conversational meaning, "vandalism" could encompass essentially all willful damage, including

---

[11] In *Bimco*, the Texas Supreme Court considered the theft-vandalism issue in the context of an insurance policy the wording of which is so different that it is of little assistance here. *Id.* at 354-55.

[12] We reject Underwriters' contention that the Laws waived this argument by failing to raise it to the district court. The Laws' assertions of vandalism to the district court were perhaps not robust, but they were sufficient to eschew waiver. In their response to Underwriters' motion for summary judgment, the Laws repeatedly referred to the possibility that the damage was vandalism. Furthermore, the parties' arguments are based entirely on the policy's vandalism provision, in which (1) coverage of vandalism, (2) the theft exclusion, and (3) the ingress/egress exception are found.

damage caused in the course of a burglary.[13] The Laws' commercial property policy, however, defines "vandalism" more narrowly, as "willful *and malicious* damage to, or destruction of, the described property" (emphasis added), from which it then carves out and excludes from coverage that subset of damage which is caused in the course of committing a theft.

The Laws nevertheless contend that the purpose for which damage is done is irrelevant to determining whether the cause of the damage is vandalism. But their position ignores the distinction that the policy makes and would render the theft exclusion meaningless, in contravention of the rule that each element of a contract or insurance policy must be given effect. We reject the Laws' contention. The policy provisions at issue, *viz.*, the vandalism coverage, the theft exclusion, and the ingress/egress exception, indisputedly turn on the purpose for which the damage at issue is done: (1) Damage done for no purpose other than to destroy property for destruction's sake is "vandalism;"[14] (2) incidental damage done in furtherance of thievery falls within the narrower category of damage resulting from theft; (3) damage to the insured building done by burglars entering or leaving the building that they attempt to burglarize falls into the even narrower ingress/egress exception. That said, however, we should not be misunderstood to say that vandalism can never occur during a theft and vice versa. These are not per se mutually exclusive events.[15] We hold only that

---

[13] *Webster's* defines "vandalism" as "1. deliberately mischievous or malicious destruction or damage of property." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY, 1579 (1989).

[14] *Smith v. Shelby Ins. Co. of Shelby Ins. Group*, 936 S.W.2d 261, 265 (Tenn. Ct. App. 1996) (defining "vandalism," as "ordinarily understood" as "damaging something simply for the sake of damaging it"). The court in *Shelby* considered a vandalism provision identical to the one at issue here and held that a portion of damage done during a theft for which there could have been no purpose other than destruction was vandalism. The remainder of the damage, committed in furtherance of the theft, was not vandalism. *Id.* Here, there is no evidence that any part of the damage was damage for damage's sake.

[15] *See id.*

damage done *in furtherance of* a theft or attempted theft is damage that falls within the theft exclusion of the instant policy.

We also reject the Laws' contention that any damage which is excessive and unnecessary to accomplish a theft, even if in furtherance of it, is vandalism. That one thief chooses to pick a lock to gain entry while another takes an axe to the door cannot be the basis for different coverage outcomes under the same insurance policy. The Laws would have us deny recovery to the first hypothetical policyholder because the damage was minimal or non-existent and, therefore, entirely necessary to accomplish the theft, but grant recovery to the latter one because the damage was significant or excessive and, therefore, vandalism.[16] Courts would have to consider hypothetical alternative methods of breaking and entering to determine whether the damage actually inflicted was or was not greater than necessary. We decline to adopt such a convoluted approach and instead look to the purpose of the damage, not its degree.

Here, the damage was solely in furtherance of stealing the copper. Just enough of the air-conditioning units' exterior metal paneling was torn away to allow access to the machinery inside. Likewise, the actual cooling mechanisms inside the paneling were damaged by the thieves for the sole purpose of gaining access to the copper. There is no evidence of "malicious" damage in any of this, yet the policy defines vandalism conjunctively as willful and malicious damage to the property. Even though the damage done might have exceeded the minimum required to gain access to the copper tubing, it was done entirely to gain such access. As such, the damage was done solely to further the theft and was not vandalism as that term is used in the policy.

---

[16] At least one court has expressly considered and rejected this sort of relational distinction. *Gen. Star Indem. Co. v. Zelonker*, 769 So. 2d 1093, 1094 (Fla. Dist. Ct. App. 2000) (finding an argument that thieves could have stolen electrical wiring without damaging the meter box "beside the point").

The plain language of the instant insurance policy leaves little room for debate that this was damage "caused by or resulting from" theft and is thus excluded from coverage by virtue of the theft exclusion to the coverage of vandalism. Thieves *caused* the damage in the course of gaining access to the object of their theft, i.e., the copper tubing components of the air-conditioning units. But for the thieves' desire to steal the copper tubing, the damage would not have occurred. The damage therefore falls squarely within the theft exclusion — unless, that is, it is covered by virtue of the theft exclusion's ingress/egress exception.

*3. The Ingress/Egress Exception*

In the vandalism/theft/burglary inquiry, the most narrow and complex question asks whether the incidental damage to the housings and machinery of the roof-mounted air-conditioning units can be shoe-horned into the ingress/egress exception to the theft exclusion from vandalism coverage. Again, we first turn to the text: " . . . except for building damage caused by the breaking in or exiting of burglars." The district court determined that the air conditioners were part of the insured building because they are fixtures, and the insurance policy defines "building" to include fixtures.[17]

The Laws insist that because of that definition, the thieves' entry into the roof-top fixtures is equivalent to "breaking in or exiting" the building. Following the Laws' argument, the air conditioners as fixtures are essentially surrogates for the building itself. The dissent agrees, finding the policy ambiguous and the Laws' contention a reasonable interpretation of it. Relying on the pro-insured

---

[17] The "Building and Personal Property Coverage Form" (the "Coverage Form") states that "Covered Property, *as used in this Coverage Part*, means the type of property described in this section. . . . **a. Building,** meaning the building or structure described in the Declarations, including . . . (2) Fixtures, including outdoor fixtures." (emphasis added).

treatment of insurance policy ambiguity, the dissent asserts that we must adopt the Laws' view.

Again, however, we perceive no ambiguity. The policy employs a common phrase in a familiar context: "breaking in," as in a burglary. Texas courts have stated that the phrase "to break in" in the context of burglary is commonly understood.[18] Despite the dissent's comprehensive disquisition on motor vehicle burglary cases, we remain convinced that "breaking in" to a building unambiguously contemplates nothing more expansive than an attempt to enter bodily into the interior space of the building as bounded by the walls, floors and ceilings. The courts of Texas agree:

> *The protection is to the interior or enclosed part of the described object*, be it a house, a building or a vehicle. . . . Taking items attached to the outside of the vehicle, house, or building that does not reflect an entry into an interior or enclosed part of the described object in order to steal does not constitute the offense of burglary.[19]

We certainly do not doubt that the large, self-contained air-conditioning units installed atop the exterior roof of the Laws' building can be considered fixtures.[20] Neither do we ignore the policy provision that describes the insured "building" to include fixtures, *inter alia*.[21] But neither fact convinces us that the

---

[18] *Landry v. State*, 653 S.W.2d 28, 29 (Tex. Crim. App. 1983); *see also Hopkins v. State*, 864 S.W.2d 119, 120 (Tex. App.—Houston [14th Dist.] 1993, pet ref'd) (emphasizing that the thief must break the "plane" of the thing, here, the bed of a pickup truck, he is entering to constitute burglary).

[19] *Griffin v. State*, 815 S.W.2d 576, 579 (Tex. Crim. App. 1991) (emphasis added).

[20] A "fixture" is "1. something securely, and usually permanently, attached or appended, as to a house, apartment, building, etc." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY, 538 (1989). Black's defines the term as "[p]ersonal property that is attached to land or a building and that is regarded as an irremovable part of the real property." BLACK'S LAW DICTIONARY, 669 (8th ed. 2004).

[21] We do note, though, that immediately following the description on which the Laws (and the dissent) rely is an entirely separate "definition" of "Your Business Personal Property"

phrase "breaking into or exiting" should be given a meaning any broader than its ordinarily understood meaning: entry into the interior space of the building itself. Entry into a fixture is not automatically congruent with entry into the building;[22] that air conditioners as fixtures are part of the building cannot so radically alter the common understanding of what "breaking in" to a building entails. We interpret the language of the burglary ingress/egress exception to the theft exclusion to mean that the insurer will only pay for collateral damage caused by the burglars' attempt to gain access to the interior of the building, as commonly understood. We are not alone in this view. The *Zelonker* court, one of two courts to have considered the instant policy language, noted that "the plain meaning of this provision is that the policy provides coverage where thieves bodily enter or exit the building, as by breaking a door or window."[23]

Texas's definition of "burglar" offers further support. A "burglar" is one who, without the owner's consent, "(1) enters a habitation, or a building (or any

---

which also includes the term "fixtures" without distinction. The Laws offer no explanation for how the description of "building" can be the sole applicable understanding of "fixtures" when it is immediately followed by a description of an entirely different term that also includes "fixtures." Given the two competing provisions, we hardly think the "definition" on which the Laws rely can bear the weight they place on it.

[22] In the more common case, entry into the building will be a prerequisite to entry into a fixture, mooting the issue. In the more extreme case, it is possible that a fixture may be a means of entry into the building itself. Underwriters concedes that coverage would apply to damage caused during a Mission: Impossible-style entry through an air-conditioning duct (referring, of course, to the Tom Cruise movie franchise and former television series). Neither scenario applies here.

[23] *Gen. Star Indem. Co. v. Zelonker*, 769 So. 2d 1093, 1094 (Fla. Dist. Ct. App. 2000). In that case, thieves broke into a building's exterior meter boxes to steal copper electric wire and also damaged an air conditioner. The court denied coverage for the damage to the meter boxes because the damage was the result of theft and did not constitute building entry. The court affirmed the award for damage to the air conditioner based on a jury finding that the damage was vandalism, not theft.

In the second case that considered the language here at issue, the plaintiff did not claim that any of the loss would fall within the ingress/egress exception. *Smith v. Shelby Ins. Co. of Shelby Ins. Group*, 936 S.W.2d 261, 265 (Tenn. Ct. App. 1996).

portion of a building) not then open to the public with intent to commit a felony, theft, or an assault; . . . (3) enters a building or habitation and commits or attempts to commit a felony, theft, or an assault."[24] That statute defines "enter" as "to intrude: (1) any part of the body; or (2) any physical object connected with the body."[25] The second half of the insurance policy exception, "or exiting," provides further illumination. "Exit" is commonly defined as: "1. a way or passage out. 2. a going out or away; departure."[26] The definitions make clear that "breaking in or exiting" requires bodily intrusion into the interior of the building. The thieves in this case sought no bodily passage into or out of the building; they sought only the copper innards of free-standing exterior fixtures. Although the thieves might have damaged a part of the building during the commission of their crime, they did not do so while in the act of breaking into or exiting the building itself. Indeed, the thieves never sought or gained access to the interior of the building itself, i.e., they never became "burglars" vis a vis the building *qua* building.

As we observed earlier, the dissent's entire reasoning is founded on its view of the policy's wording as ambiguous. In contrast, we find no ambiguity in the words of the insurance policy or in the policy as a whole. As we thus follow the dictates of Texas law and rely on the plain meaning of the policy's language, we never reach the competing interpretations proffered by the parties as we would if we were first to conclude that the governing provisions of the policy were ambiguous.

---

[24] Tex. Penal Code Ann. § 30.02 (Vernon 2008).

[25] *Id.*

[26] Webster's Encyclopedic Unabridged Dictionary, 500 (1989).

We are guided in our analysis by the charge under Texas law to construe the contract consistently with the parties' original intent.[27] When we view the policy in this manner, we are convinced that the parties could not possibly have intended the ingress/egress exception to apply to acts that fall outside the universally understood meaning of breaking and entering into a building. We see nothing in the words and phrases of the policy that would support an inference of any other intent. This is underscored by the very inclusion of the narrow ingress/egress exception within the much broader theft exclusion. The dissent's acceptance of the Laws' proffered interpretation of the ingress/egress exception, however, renders it broader than the exclusion within which it is contained, an illogical result that cannot be reconciled with what the parties must have intended when they fit the one within the other.

As a result, we reject the Laws' assertion that the thieves' physical intrusion into the seventeen free-standing, self-contained air conditioners themselves was sufficient to qualify the thieves as "burglars" or their actions as "breaking in or exiting" the building. Such a determination would turn almost entirely on the fact that the air conditioners were outside the building proper. Had the same units been inside the building, they could not be damaged by burglars gaining entry into the building, but rather by burglars already inside.[28] We will not strain to adopt an overly expansive interpretation of the ingress/egress exception that turns artificially on the location of the fixtures, either inside or outside the building proper. Furthermore, accepting the Laws'

---

[27] *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "To achieve this objective, courts should examine and consider the *entire writing* in an effort harmonize and give effect to *all the provisions* of the contract . . . No single provision taken alone will be given controlling effect." *Id.*

[28] The dissent would have us find multiple entries with each intrusion by burglars further into the interior of the building — into the interior courtyard, into the fixture itself, and so on. Such an interpretation strays into the absurd and would eviscerate the theft exclusion.

argument would permit coverage to turn on the discrete burglary methodology employed by the thieves. For example, had the thieves taken a crane and lifted the units intact off the building's roof, there obviously would have been no "entry," even under the Laws proffered definition.[29] We have already rejected an approach that results in such varied and illogical outcomes, *supra*. Again, the Laws' arguments veer too far from the common understanding of what is meant by breaking into and exiting from a building — the unambiguous language of the ingress/egress exception.

We likewise reject the Laws' contention that, at the very least, the metal housings that contained the air-conditioning units are tantamount to outbuildings that the thieves had to break into and enter to gain access to the air conditioners inside and strip their copper. The housings in question are essentially large, custom-made metal boxes, the size of a small shed or shipping container, that contain the actual cooling machinery. They are integral parts of the air-conditioning units; the air conditioners are defined with the housings as integral components and each is mounted onto the roof as a single contraption. The metal housings are merely the most exterior components of the free-standing air-conditioning units. The fact that they come from their manufacturer with permanent protective housings made specifically for these machines and are integral components of them precludes the transformation of the thieves into burglars or their actions in gaining access to the machinery into *breaking* into a *building*. The thief who breaks into the casing is breaking into the air conditioner itself, rather than first breaking into a shed or outbuilding

---

[29] Under the Laws' interpretation, if the thieves had removed the air conditioners intact to some secure place and had then broken into them, the act would still constitute breaking into the building. The Laws' argument offers no explanation for how the air conditioners could continue to be part of the building (which they would have to be following the Laws' logic) after they had been moved far away from the insured building, long before their integrity was ever violated.

to burglarize it of the copper within the air-conditioning units inside the building.

In sum, we decline to credit any of the Laws' tortured interpretations of the uncomplicated language of the policy's ingress/egress exception. The phrase "building damage caused by the breaking in or exiting of burglars" is straightforward and unambiguous, ineluctably requiring breaking through (or attempting to break through) a building's exterior to gain access to its interior for the purpose of committing a theft crime. There is no room in the ordinary understanding of the phrase for extending its ambit to include damage caused to a roof-mounted air conditioner during the course of stealing its copper tubing. We cannot imagine that the parties could have intended this meaning when they entered into this contract of insurance. Simply put, damage caused to an exterior fixture to gain access to its own internal components is not building damage caused in gaining access to the building itself, even if that fixture is determined to be part of the building for some other policy purpose. We hold that the damage done to the casings and machinery of the Laws' roof-mounted air conditioners resulted from theft, which falls within the theft exclusion to the policy's coverage of vandalism, and did not result from the breaking into the insured building by burglars. The ingress/egress exception to the theft exclusion is inapplicable to the facts of this case.

### III. CONCLUSION

The damage suffered by the Laws resulted from neither vandalism nor the breaking into or exiting of the insured building by burglars. Rather, the damage to the Laws' air conditioners was caused by or resulted from acts of theft. As such, the policy expressly excludes coverage of the costs of repair or replacement of the Laws' air-conditioning units. We therefore reverse the judgment of the district court, vacate its award of damages and attorneys' fees to the Laws, and render judgment that the Laws take nothing. As the Laws thus recover no

damages, we need not, and therefore do not, address Underwriters' claim of error in the district court's calculation of damages.

REVERSED; VACATED; and RENDERED.

O'Connor, Justice (Ret.), dissenting:

I agree with the majority's conclusion that the damage at issue is not covered "vandalism" under the policy. *See ante*, Part II(A)(2). I reach a different conclusion as to the construction of the building damage exception to the theft exclusion, what the majority terms "the most narrow and complex question" before the court. *Id.* at 11. For this reason, I would affirm the judgment of the District Court.

As the majority recognizes, when a court interprets an insurance policy under Texas law, "[a]mbiguity is 'liberally' construed in favor of the insured." *Id.* at 5 (quoting Barnett v. Aetna Life Ins. Co., 723 S.W.2d 663, 666 (Tex. 1987)); *see also* Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984) ("It is well established that insurance policies are strictly construed in favor of the insured in order to avoid exclusion of coverage."). Thus, we adopt the construction that favors the insured "as long as [it] 'is not itself unreasonable.' " *Ante* at 6 (quoting U.S. Fid. & Guar. Co. v. Bimco Iron & Metal Corp., 464 S.W.2d 353, 355 (Tex. 1971)). Notably, we do so "[e]ven when the insurer's interpretation appears to be the more likely reflection of the parties' intent." *Id.*; *see also* Ramsay v. Maryland Am. Gen. Ins. Co., 533 S.W.2d 344, 349 (Tex. 1976) ("When the language of a policy is susceptible of more than one reasonable construction, the courts will apply the construction which favors the insured and permits recovery.").

Adhering to these interpretive mandates, I reach two conclusions as to the proper construction of the ambiguous provision before the court: First, the air conditioners must be understood to be part of the building. Second, the damage at issue is properly characterized as damage caused when burglars broke into those units. This understanding of the policy is reasonable and "avoid[s] exclusion of coverage."

17

Under the terms of the policy, the air conditioning units are part of the "building."  The policies "Building and Personal Property Coverage Form" defines the term "building" to "includ[e] . . . [f]ixtures, including outdoor fixtures."  *Ante* at 11, n.17.  Construed in the insured's favor, this definition no doubt extends to the roof-mounted air conditioning units.  Even if the coverage form could not reasonably be construed to extend to all of the policy's provisions, we would be obliged to adopt a definition of the term "building" that included fixtures, as this would be a reasonable definition that favored the insured.  There is nothing in the policy to prevent construing "building" to include fixtures.  Understanding a building to comprise in part its fixtures is perfectly reasonable.  Indeed, it is the most natural understanding of the term.  Specifically, "[i]t is common knowledge that a furna[c]e, *or air conditioner*, or light 'fixture' . . . is generally regarded by us all as part of the building to which the item is attached."  Alphonse M. Squillante, *The Law of Fixtures: Common Law and the UCC,* 89 COM. L.J. 501, 501 (1984) (emphasis added).  We are thus obliged to consider the air conditioning units to be part of the building.  Parkins Int'l v. Zurich Ins. Co., 299 F.3d 514, 520 (2002) ("When interpreting an insurance contract, Texas courts will read its terms in their plain, ordinary, and popular sense unless the policy defines a term in some other way.").

In terms of ordinary usage, it is natural to describe the damage at issue as the result of "breaking in . . . of burglars."  *Cf., e.g.,* Allstate Ins. Co. v. Smith, 450 S.W.2d 957, 959 (Tex. Civ. App. 1970) ("breaking into the floor").  The majority itself writes that the criminals "*broke into* the [air conditioning] units themselves to steal their copper condenser coils."  *Ante* at 2 (emphasis added); *see also id*. at 18 ("The thief who *breaks into* the casing is *breaking into* the air conditioner itself[.]" (emphasis added)).  They "caused the damage in the course of *gaining access to* the object of their theft."  *Id.* at 10 (emphasis added).  The damage underlying the claim

was "solely *in furtherance of stealing the copper*." *Id.* (emphasis added); *see also id*. ("[T]he actual cooling mechanisms inside the paneling were damaged by the thieves for the sole purpose of gaining access to the copper."). In every sense, penetrating a structure in order to steal something inside is aptly described as "breaking in."

Contrary to the majority, I conclude that Texas' burglary statute further supports this construction of the policy. The majority recognizes that the Texas law definition of "burglar" includes a criminal who " 'enters a habitation, or *a building (or any portion of a building) . . .* with intent to commit a . . . theft.' " *Ante* at 15 (quoting Tex. Penal Code Ann. § 30.02 (Vernon 2008)) (emphasis added). The statute also "defines 'enter' as 'to intrude . . . any part of the body; or . . . any physical object connected with the body.' " *Id.* (quoting Tex. Penal Code Ann. § 30.02 (Vernon 2008)). There can be no question that the thieves who destroyed the air conditioning units intruded parts of their bodies and/or objects connected with their bodies—their hands, arms, and/or tools—into the air conditioning units. It would have otherwise been physically impossible for the thieves to gain access to the copper parts that they intended to and did steal. In sum, far from counseling against the insured's construction of the policy, Texas law strongly supports that construction.

At its core, the court's opinion reflects the majority's conclusory assertion that the thieves "never became 'burglars' vis a vis the building *qua* building." *Id*. In turn, this assertion rests on the majority's insistence that " 'breaking in' to a building unambiguously contemplates nothing more expansive than an attempt to enter bodily into the interior space of the building as bounded by the walls, floors and ceilings." *Id.* at 12. But nothing in the policy demands such a cramped understanding of intrusion to apply only to a building's "interior space." That should be the end of the matter, because the majority's narrowing construction works to exclude coverage.

Nevertheless, Texas law offers additional support. It endorses a substantially more expansive view of entry. Texas cases involving the burglary of vehicles aptly illustrate the point. And it is wise to look to these cases "because 'enter' is defined exactly the same for burglary of a building or habitation as it is for burglary of a vehicle[;] the element of intrusion into a building or habitation under § 30.02 should be of the same nature as intrusion into a vehicle under § 30.04." Griffin v. Texas, 815 S.W.2d 576, 579 (Tex. Crim. App. 1991). For example, in Hopkins v. Texas, 864 S.W.2d 119, 120 (Tex. App. 1993, *pet ref'd*), the court concluded that the defendant committed burglary when he stole a ladder off of "a ladder rack . . . attached to the back of [a] truck." The court explained that the defendant "could not have loosened the bungee cords [that affixed the ladder to the rack] without placing his hand through [a] railing and into the plane created between the dome of the ladder rack and the side of the truck." *Id.* "Consequently," the court concluded, the defendant "penetrated the interior of the truck." *Id.*; *see also* Coleman v. State, 608 S.W.2d 923, 924 (Tex. Crim. App. 1980) (concluding that the defendant broke in "by intruding . . . into [a pickup] truck bed" and that "it was not incumbent upon the State to prove . . . that entry must have been into the cab portion of the vehicle"); Smith v. State, 781 S.W.2d 675 (Tex.App. 1989, *pet. ref'd*) (reaching into bed of pickup truck to remove flares and tires constituted entry). More compelling, at least one Texas court has found "entry" into a vehicle when, as here, the burglar broke into a fixture. Soto v. State, 782 S.W.2d 17, 19 (Tex.App. 1989, *pet. ref'd*) (removal of tools from a toolbox attached to a pickup truck constituted entry into the vehicle). These cases cannot be reconciled with the majority's view that a burglar can enter only the "interior space" of a building.

Lastly, the majority construes the policy to exclude coverage in order to avoid what it perceives to be two "varied and illogical outcomes." *Ante* at 18. First, the majority assumes that

"[h]ad the same units been inside the building," the plaintiff's claim necessarily would have failed because it would have been caused by "burglars already inside" the building. *Id.* at 17. Based on this assumption, the majority faults the insured's construction of the policy because it "turns artificially on the location of the fixtures, either inside or outside the building proper." *Id.* Second, the majority is unwilling to "permit coverage to turn on the discrete burglary methodology employed by the thieves," stressing that "[h]ad the thieves taken a crane and lifted the units intact off the building's roof, there obviously would have been no 'entry.' " *Id.* I disagree with the assumption underlying the first "outcome" and the implications the majority draws from both.

I find nothing in the policy to support the majority's assumption that coverage extends only to damage caused in the very first penetration into the building's outermost perimeter. And I think this assumption would yield "varied and illogical outcomes." *Id*. at 18. For example, imagine that an insured property contains an outer entryway into an interior courtyard or hall and that a locked door leads from the courtyard or hall farther into the building. The majority finds it obvious that the policy would cover only damage to the outer entryway, not the interior door. It asserts that each hypothetical must be understood to describe "multiple entries with each intrusion by burglars further into the interior of the building," *id.* at 17, n.28, presumably into the "interior space of the building as bounded by the walls, floors and ceilings," *id.* at 12. I am not convinced. And how substantial must a courtyard's "ceilin[g]" be in order to exclude coverage for damage caused to its interior doorway? What if it lacks a ceiling altogether? Similarly, imagine that valuable devices or appliances are sealed within a building's interior walls. Under the majority's view, damage caused by tearing into these walls could not be covered. I am not certain this assumption holds true. And what if the walls were exterior walls? Would tearing out

an appliance amount to entry into the "interior space of the building as bounded by the walls, floors and ceilings?" These are issues we need not reach today, as "[n]either scenario applies here." *Id.* at 13, n.22. Nevertheless, these scenarios illustrate that the majority's reasoning rests on assumptions that are in my view unwarranted.

At a more fundamental level, the majority's requirement that coverage vary neither with the location of a fixture nor the method of its theft betrays our obligation to "strictly constru[e]" the policy "in favor of the insured in order to avoid exclusion of coverage." Puckett, 678 S.W.2d at 938. We are to ask whether it is reasonable to construe the policy in favor of recovery in this case given the location of these units and the method of their destruction. Damage to units differently situated or more elaborately stolen might or might not reasonably give rise to liability. *Cf. ante* at 13, n.22 (assuming that "coverage would apply to damage caused during a Mission: Impossible-style entry through an air-conditioning duct"). But this is no reason to construe the policy against the insured before the court today.

The air conditioning units at issue were destroyed when thieves "*broke into* the units . . . to steal their copper condenser coils." *Ante* at 2 (emphasis added). Liberally construing the policy in the insured's favor, these units were part of the building, and they consequently fall within the policy's building damage exception to its theft exclusion. I would thus affirm the judgment of the District Court.