**ESSEX INSURANCE COMPANY,**
**Appellant**

**v.**

**ELDRIDGE LAND, L.L.C., Appellee.**

**No. 14–09–00619–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

May 20, 2010.

Marc J. Wojciechowski, Spring, Jonathan Christopher Paugh, for Appellant.

Cory Daniel Itkin, Houston, Micajah Daniel Boatright, Houston, Jeffery James Davis, Jeffrey Ragan Seely, Kurt B. Arnold, Houston, for Appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and CHRISTOPHER.

## OPINION

ADELE HEDGES, Chief Justice.

In this cause, we are called upon to interpret provisions in a commercial property insurance policy concerning vandalism and damage from theft. Although courts in other jurisdictions have addressed substantially similar provisions, arriving at conflicting results, this is the first Texas appellate case to raise these precise issues.

Eldridge Land, L.L.C. sued Essex Insurance Company, after Essex denied coverage for damage to Eldridge's property which was insured under a policy issued by Essex. Both parties filed motions for summary judgment, asserting that there were no issues of material fact and that

resolution of the case principally involved interpretation of policy language. The parties also entered into a limited stipulation of evidence regarding damages. The trial court held that the damage to Eldridge's property was covered under the terms of the policy. Accordingly, the trial court granted Eldridge's motion, denied Essex's motion, and awarded judgment favoring Eldridge for $300,000 in actual damages, plus prejudgment interest and attorney's fees. The judgment also contained an award of attorney's fees favoring Essex and conditioned on Essex prevailing on appeal.

In this proceeding, Essex has challenged the rulings on the motions for summary judgment, and Eldridge has filed a cross-appeal challenging the contingent award of attorney's fees for Essex. We reverse the trial court's judgment and render judgment favoring Essex but without an award of attorney's fees.

## I. Background

Eldridge owns a vacant building, which once housed a grocery store.[1] To insure the building, Eldridge purchased a commercial property insurance policy from Essex. Among other provisions, this policy contains a clause providing coverage for vandalism, an exclusion for damage "[c]aused by or resulting from theft," and an exception to the theft damage exclusion for "damage caused by the breaking in or exiting of burglars." The language of these provisions reads as follows:

A. COVERED CAUSES OF LOSS

When Basic is shown in the Declarations,[2] Covered Causes of Loss means the following:

. . . .

8. Vandalism, meaning willful and malicious damage to, or destruction of the described property.

We will not pay for loss or damage:

a. . . . .

b. Caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

On March 28, 2006, Eldridge's property sustained considerable damage. Some intruders apparently forced their way into the building and damaged sheetrock, ceiling tiles, electrical conduit boxes, and wall coverings. They also removed copper wiring and copper pipe from the building. Eldridge thereafter filed a claim with Essex seeking coverage for this damage under the policy. Essex denied the claim based primarily on the policy exclusion for loss or damage caused by or resulting from theft. Paul R. White & Company, Inc., the independent claims adjuster hired by Essex, further took the position that the value of the damage done by the intruders in gaining entrance to the building was below the $5,000 policy deductible, with the result that there was no coverage under the policy. Eldridge then filed the present lawsuit against Essex and Paul R. White & Company.

In its petition, Eldridge alleged that "vandals broke into the Building and proceeded to commit multiple acts of vandalism[i.e.,] willful and malicious damage to, and destruction of, the Building." Against both Essex and White, Eldridge asserted claims for negligent misrepresentation, fraud, and Insurance Code and Deceptive Trade Practices Act violations. Against

1. In its brief, Eldridge describes the building as "once vacant." It is unknown whether the building is currently occupied, but at all times relevant to this case, the parties agree that it was vacant.

2. "Basic" in this context referred to a level of insurance coverage offered.

Essex, Eldridge further asserted claims for breach of contract and bad faith. And against Paul R. White & Company, Eldridge additionally asserted a claim for tortious interference with contract.

Eldridge and Essex each filed motions for summary judgment on the limited issue of "policy coverage," *i.e.*, Eldridge's breach of contract cause of action. In its motion, Eldridge maintained that the property damage was primarily caused by vandalism and that only items actually removed from the property (the copper wiring and pipes) should be excluded from coverage. In its motion, Essex contended that all of the damage, except that caused by the intruders' initial entry, should be excluded under the exclusion for loss or damage caused by or resulting from theft.

In a deposition excerpt attached to Essex's motion, Eldridge's corporate representative, Jay Azimpoor, acknowledged that he did not see any damage in the building that he believed was caused other than "during the process of removing either copper piping or copper wiring or anything else from the building." He further acknowledged that various types of specific damage that he was asked about were caused in the process and for the purpose of taking either copper pipes or copper wiring from the building. Also attached to Essex's motion was an affidavit from William J. Price, a claims manager for Paul R. White & Company, who averred that the damage caused to the building, where both he and an Eldridge representative believed the intruders had broken in, was valued below $5,000.

After the trial court granted Eldridge's motion and denied Essex's motion, Eldridge nonsuited its claims against Paul R. White & Company. Eldridge and Essex then entered an agreed statement of facts establishing amounts for damages, attorney's fees, and prejudgment interest. The

trial court entered a final judgment favoring Eldridge for $384,147.90 (actual damages plus prejudgment interest and attorney's fees). The trial court also included in its judgment an amount for Essex's attorney's fees should Essex prevail on appeal. Lastly, the trial court expressly stated that "[a]ll relief requested in this case that has not been expressly granted is hereby denied," and "[t]his judgment finally disposes of all parties and claims and is appealable."

## II. Standards of Review

We review a grant of summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *see also Knott,* 128 S.W.3d at 216. "A summary judgment may be based on uncontroverted testimonial evidence of an interested witness ... if the evidence is clear, positive, direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex.R. Civ. P. 166a(c). When both sides have moved for summary judgment, and the trial court has granted one motion and denied the other, we will review the summary judgment arguments and evidence presented by both sides and determine all questions raised therein. *Comm'rs Court of Titus County v. Agan,* 940 S.W.2d 77, 81 (Tex.1997). In such a situation, we will render the judgment that the trial court should have rendered. *Id.*

The parties concur that the primary question before us concerns the correct interpretation of the insurance policy. We generally construe insurance policies in accordance with the ordinary rules of contract construction. *Am. Mfrs. Mut.*

*Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). In applying these rules, our ultimate goal is to ascertain the parties' intent as expressed in the language of the policy. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex. 1998). In order to achieve this goal, we will examine and consider the entire writing in an effort to harmonize and give effect to all of the policy provisions "so that none will be rendered meaningless." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). We interpret language in a policy according to its ordinary and generally accepted meaning unless the policy indicates that the words used are intended to impart a particular technical or otherwise different meaning. *Schaefer,* 124 S.W.3d at 158.

■■■■ Whether policy language is ambiguous is a question of law. *Id.* at 157. Ambiguity does not arise simply because the parties offer conflicting interpretations; rather, ambiguity exists only when the contract is susceptible of two or more reasonable interpretations. *Id.* Usually, if language in an insurance policy is deemed susceptible to more than one reasonable interpretation, the reasonable construction most favorable to the insured will be imposed. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991). Consequently, we construe an ambiguous insurance policy strictly against the insurer and liberally in favor of the insured. *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 666 (Tex.1987).

### III. Analysis of Policy Provisions

The policy provisions at the heart of the dispute here provided coverage for "[v]an-

dalism, meaning willful and malicious damage to, or destruction of the described property," but excluded coverage for damage "[c]aused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars." In its appellate briefing, Eldridge contends that (1) the damage caused to the property in the course of removing the copper wiring and pipes was vandalism and was not excluded from coverage by the theft exclusion; (2) alternatively, the damage was caused by the intruders "breaking in" to parts of the building to retrieve the copper and thus fell under the exception to the theft exclusion; and (3) at a minimum, the interpretation propounded by Eldridge is reasonable and thus the contract should be construed in its favor, as the insured, under the rules of policy construction.[3] Essex, on the other hand, contends that the damage caused by the intruders' removing the copper was (1) not vandalism as defined by the policy; (2) expressly excluded by the theft exclusion; and (3) not included in the narrow exception to that exclusion for the "breaking in or exiting of burglars."

Several cases in other jurisdictions have considered substantially similar if not identical policy language and have applied it to generally analogous fact patterns. These cases have arrived at different conclusions. We will briefly discuss each of the cases on which the parties place the most emphasis before turning to our own analysis of the policy language.

### A. Eldridge's Cases

Eldridge relies primarily on the Alabama Supreme Court's opinion in *Aetna Casualty & Surety Co. v. Ardizone,* 481

---

**3.** In its pleadings at trial, Eldridge argued only that the damage was covered as vandalism and did not make the argument that the damage fell under the "breaking in" excep-

tion to the theft exclusion. We will consider this argument, however, for the sake of completeness in our construction of the policy language.

So.2d 380 (Ala.1985), and the Louisiana court of appeals opinion in *Haas v. Audubon Indemnity Company,* 722 So.2d 1022 (La.App. 3d Cir.1998).[4] In *Ardizone,* the Alabama Supreme Court considered circumstances in which "vandals ... destroyed or removed electrical and refrigeration fixtures," causing "extensive damage" to a warehouse. 481 So.2d at 381. The court determined that the term "vandalism" should be construed quite broadly in keeping with its common usage. *Id.* at 384.[5] The court further concluded that the policy provided "coverage for acts of vandalism or damage done to the building in connection with a burglary or theft" and that "[t]he intent of the vandals at the time of the destructive act [was] irrelevant to [the] issue of liability." *Id.* at 384–85. Ultimately, the court held the insurer liable for all of the damage inflicted except for certain stolen items; however, the court held the insurer liable for wiring and tubing that was removed based on the notion that such items were damaged or vandalized regardless of whether they were then removed from the premises. *Id.* at 385.

In *Haas,* the Louisiana court of appeals considered a fact pattern wherein unknown persons "broke into" a large building and caused "massive damage to its interior," including to the walls, flooring, fixtures, and duct system, apparently while removing pipes and wires for their salvage value. 722 So.2d at 1023–24. The court explained that the theft provision was merely "a narrow exception to the vandalism coverage" and did "not exclude vandalism damage caused prior to or concurrently with a theft." *Id.* at 1027. The court

then concluded that because of the extensive nature of the damage done to the building ("utter destruction"), the evidence was sufficient to demonstrate that the damage was done maliciously and thus should be considered to have resulted from vandalism. *Id.* Ultimately, the court described the theft exclusion as patently ambiguous and therefore construed the policy in favor of coverage. *Id.*

In the trial court, Eldridge also placed considerable emphasis on the Texas Supreme Court's opinion in *United States Fidelity & Guaranty Co. v. Bimco Iron & Metal Corp.,* 464 S.W.2d 353 (Tex.1971). Eldridge appears to have decided against such emphasis on appeal. Although that opinion dealt with a substantially similar fact pattern—building damage inflicted by thieves—the insurance policy provisions at issue were significantly distinct from those at issue in the present case. *Id.* at 354–55; *see also Certain Underwriters at Lloyds, London v. Law,* 570 F.3d 574, 578 n. 11 (5th Cir.2009) (distinguishing *Bimco* because of differing policy language). In *Bimco,* the policy specifically covered "damage to the building(s) ... caused by burglars." 464 S.W.2d at 354–55. The policy at issue in the present case did not contain such a provision, or such broad coverage, respecting damage by burglars.

## B. Essex's Cases

Essex relies primarily upon the Florida court of appeal's opinion in *General Star Indemnity Co. v. Zelonker,* 769 So.2d 1093 (3rd D.Fla.2000), the Tennessee court of appeals opinion in *Smith v. Shelby Insurance Company of Shelby Insurance*

---

4. As will be discussed below, Eldridge also places emphasis on the dissent filed in one of the cases relied upon by Essex. *See Certain Underwriters at Lloyds, London v. Law,* 570 F.3d 574, 583–86 (5th Cir.2009) (O'Connor, S.C.J., dissenting).

5. The *Ardizone* court did not mention whether the policy at issue in that case contained a specific definition of "vandalism" as the policy before us does.

*Group,* 936 S.W.2d 261 (Tenn.Ct.App. 1996), and the Fifth Circuit's analysis in *Law,* 570 F.3d at 583–86. In *Zelonker,* the Florida court considered a highly similar fact-pattern wherein unknown individuals entered a warehouse owned by the insured and removed copper wiring from an electric meter box and conduits, leaving holes apparently used to extract the wiring. 769 So.2d at 1094. The court held that such damage was plainly "damage ... [c]aused by or resulting from theft." *Id.* Further, the court expressly rejected the insured's argument that breaking into fixtures within the building constituted "breaking into the building itself," holding instead that the policy provided coverage only for "where thieves bodily enter or exit the building, as by breaking a door or window." *Id.* The court explained that such was the "everyday meaning" of the policy terms. *Id.* at 1094–95.

In *Smith,* the Tennessee court also addressed similar facts where an unknown person or persons entered a building and "ripped out electrical wiring, plumbing pipes, and condenser coils in the air conditioning system, in order to extract copper wiring and tubing." 936 S.W.2d at 262. The interior of the building, including the air conditioning system, suffered extensive damage. *Id.* The court concluded that the damage was "[c]aused by or resulting from theft" and did not result from vandalism. *Id.* at 265. In doing so, the court emphasized that the policy's definition of "vandalism" contemplated "willful and malicious damage," and that "every knowledgeable witness [including Smith himself] testified that the apparent motivation for the entry ... was for the stealing of copper wiring and tubing," not for maliciously inflicting property damage. *Id.* at 265–66. The court found the policy language "clear and unambiguous" and held that the damage was excluded by the theft provision. *Id.* at 266.

In *Law,* the Fifth Circuit considered a situation in which thieves stole copper tubing from inside seventeen commercial air conditioning units affixed to the roof of a vacant office building. 570 F.3d at 575. In order to extract the tubing, the thieves "tore off" panels in the exterior housing of the units, "then broke into the units themselves." *Id.* The court recognized that the question of coverage turned "on whether the damage to the ... air conditioners [was] (1) vandalism, (2) damage caused by or resulting from theft, or (3) building damage caused by the breaking in or exiting of burglars." *Id.* at 576 (internal parentheticals omitted). Utilizing Texas insurance policy construction law, the majority of the court determined that the policy was not ambiguous but instead expressed the parties' clear intent not to cover the type of damage claimed. *Id.* at 578. "Vandalism," the majority explained, is broad enough in common parlance to cover damage caused by burglars, but the contract provided a more precise definition: "willful and malicious damage." Based on this definition, the majority concluded that coverage turned on the purpose for which particular damage was done:

(1) Damage done for no purpose other than to destroy property for destruction's sake is "vandalism;" (2) incidental damage done in furtherance of thievery falls within the narrower category of damage resulting from theft; (3) damage to the insured building done by burglars entering or leaving the building that they attempt to burglarize falls into the even narrower ingress/egress exception.

*Id.* at 578–79. Because the damage at issue in *Law* appeared to have been done solely to gain access to the copper tubing, the majority held that the damage was

excluded under the theft exclusion. *Id.* at 579.

The majority further rejected the notion that the thieves' entry into the air conditioning units constituted "breaking in" to the building under the policy exception. *Id.* at 580. Instead, the majority interpreted the breaking-in exception, pursuant to the "common understanding," as contemplating "nothing more expansive than an attempt to enter bodily into the interior space of the building as bounded by the walls, floors, and ceilings." *Id.* at 580–81. Referring specifically to the policy, the majority stated that coverage existed under the "breaking in" exception only "where thieves bodily enter or exit the building, as by breaking a door or window." *Id.* at 581 (quoting *Zelonker*, 769 So.2d at 1094). The majority further indicated that the "or exiting" language in the exception also suggested that a bodily intrusion was required for "breaking in." *Id.* Ultimately, the majority concluded that the damage caused by the burglars to the air conditioning units was not covered under the policy as either vandalism or as damage caused by the breaking in or exiting of burglars from the building. *Id.* at 583.

In her dissent in *Law*, Justice Sandra Day O'Connor, sitting by assignment, first agreed with the majority that the damage to the air conditioning units was not covered as vandalism under the policy, but she then disagreed with the majority as to whether the damage was caused by the "breaking in … of burglars." *Law*, 570 F.3d at 583 (O'Connor, S.C.J., dissenting). Deeming the policy language ambiguous, Justice O'Connor adopted a construction that she considered reasonable favoring the insured. *Id.* at 583–84. She explained that the air conditioning units were part of the building and thus the burglars' penetration of those units constituted "breaking in" to the building. *Id.* at 584–85.

## C. Our Conclusions

▪ We begin our analysis by noting that the cases cited by Eldridge are, at least to some degree, distinguishable from the circumstances presented in the case before us. For example, the court in *Haas* emphasized the extensive nature of the damage, stating "in view of the utter destruction done to the building, the acts should be considered vandalism." 722 So.2d at 1027. In contrast, in the present case, as in *Smith*, the evidence was clear that all of the damage was done for the purpose of removing the stolen pipes and wiring. 936 S.W.2d at 265–66. The policy provisions in *Ardizone* appear to differ significantly from those at issue in the present case, although because the *Ardizone* court does not provide the exact wording for the vandalism coverage in that case, it is impossible to determine just how different it is from that in the policy before us. 481 So.2d at 382 (quoting significantly different theft exclusion). Furthermore, the *Ardizone* court relied heavily on the Texas Supreme Court's *Bimco* opinion which, as explained above, is readily distinguishable from the facts of the present case based on significant differences in the policy language at issue. Because of the differing circumstances presented in these cases, we do not find them persuasive.

▪ Turning to the policy language itself, we find it to be unambiguous, *i.e.,* not susceptible of two or more reasonable interpretations. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex. 2003). The fact that other courts have found ambiguity and have reached differing interpretive conclusions does not, by itself, persuade us otherwise. *See Betco Scaffolds Co. v. Houston United Cas. Ins. Co.,* 29 S.W.3d 341, 344 (Tex.App.-Houston

[14th Dist.] 2000, no pet.). The policy covered "[v]andalism, meaning willful and malicious damage to, or destruction of the described property," but excluded coverage for damage "[c]aused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars." The theft exclusion appears within the paragraph providing coverage for vandalism and was clearly intended as an exclusion or exception to the vandalism coverage.[6] In circumstances where the more specific exclusion applies, it is axiomatic that there is no coverage under the more general coverage provision. *See, e.g., Gomez v. Hartford Co. of the Midwest,* 803 S.W.2d 438, 442 (Tex.App.-El Paso 1991, writ denied). Here, the summary judgment evidence established that all damage above the policy deductible was caused by or resulting from theft. Thus, as explained in the *Law* majority, *Smith, Zelonker,* and the *Law* dissent, the theft exclusion governs unless the "breaking in" exception applies.

We concur with the *Law* majority and the *Zelonker* court in concluding that the "breaking in" exception does not contemplate that breaking into fixtures (or walls, ceilings, and floors) for purposes of extracting pipe or wiring would fall within the exception. *Law,* 570 F.3d at 579; *Zelonker,* 769 So.2d at 1094. As explained in *Law,* this is not the common usage of the phrase "breaking in." 570 F.3d at 580–81. Causing "building damage" by "breaking

in" contemplates the gaining of bodily entry into the interior space of a building, not knocking holes in walls once inside.[7] Furthermore, the policy language itself supports this conclusion in that "breaking in" is paired with "exiting" in such a way that the two concepts can be viewed as opposites. In common parlance, one would not speak of exiting a fixture (or a wall, ceiling, or floor) that had been opened up to extract pipes or wiring. Instead, the exception is logically read as being limited to the bodily entry or exit of thieves from a building. *See id.* at 581; *see also Zelonker,* 769 So.2d at 1094.

Because (1) the policy excluded damage caused by or resulting from theft, (2) the evidence established that all damage above the amount of the policy deductible was caused by or resulting from theft, and (3) no exception to the theft exclusion applies, the trial court erred in holding that the policy provided coverage for the stipulated damage. We sustain Essex's sole issue.

## IV. Cross Appeal

In its cross-appeal, Eldridge contended that the trial court erred in awarding attorney's fees to Essex in the event that Essex prevailed on appeal. Specifically, Eldridge contended that there was no contractual or statutory basis for such an award in this case. In a letter filed with this court, Essex agreed with Eldridge's "arguments and authorities" and conceded

---

**6.** This view is supported by the fact that the theft exclusion was contained within subparagraph "b" under the vandalism coverage paragraph, and subparagraph "a" excluded damage to glass that was "part of a building structure or an outside sign." These paragraphs exclude coverage for types of damage that would otherwise be included within the vandalism coverage.

**7.** In a sense, the present case presents an even clearer fact pattern for rejecting applica-

tion of the "breaking in" exception than did the facts in *Law.* Here, the thieves caused building damage below the deductible while gaining entry to the interior space and then proceeded to cause additional damage in order to extract the copper pipes and wiring; whereas in *Law,* the thieves gained entry only to the inside of air conditioning units and the housing surrounding the units. 570 F.3d at 575.

that there was no contractual or statutory basis for the award. We also agree that the trial court erred in conditionally awarding fees to Essex. The insurance policy does not provide for such a recovery; neither does any statute. *See Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 95 (Tex.1999) ("We have consistently held that a prevailing party cannot recover attorney's fees from an opposing party unless permitted by statute or by contract between the parties."); *Cytogenix, Inc. v. Waldroff,* 213 S.W.3d 479, 490–91 (Tex. App.-Houston [1st Dist.] 2006, pet. denied) (explaining that party successfully defending against breach of contract action was not entitled to attorney's fees under Texas Civil Practice and Remedies Code § 38.001). Accordingly, we sustain Eldridge's cross-appeal.

We reverse the trial court's judgment in its entirety, including the conditional award of attorney's fees to Essex, and render judgment that Eldridge take nothing on its claims against Essex.